# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

KRYSTA SUTTERFIELD,

                       Plaintiff,

v.

CITY OF MILWAUKEE, JAMIE HEWITT,
AARON BERKEN, JAMES FLORIANI,
BRANDON BARANOWSKI,
RUSSELL HUCK, and ALAN CARSKY,

                       Defendants.

Case No. 11-CV-486-JPS

ORDER

       Plaintiff Krysta Sutterfield has sued the City of Milwaukee and several police officers, alleging that those police officers violated her civil rights in detaining her and seizing her guns after they were notified that Ms. Sutterfield had made a suicidal threat to her psychologist. (Docket #19). The parties submitted cross-motions for summary judgment, which are now fully briefed. (Docket #28, #29, #31, #36, #37, #38). Having considered the merits of those briefs, the Court concludes that the City of Milwaukee and the police officer defendants are entitled to summary judgment.

1.      BACKGROUND

       The parties agree about practically all of the material facts in this case. (*See* Pl.'s Resp. 2, Def.'s Resp. 3–4). The only factual issue that potentially remains in dispute is that of damages, if the Court were to determine that summary judgment is not proper at this stage of the litigation.

       On March 22, 2011, at around noon, Dr. Michelle Bentle, a physician at Columbia/St. Mary's Hospital, placed a 911 call, indicating that Ms.

Sutterfield had left her office after expressing suicidal thoughts. (DPFF ¶ 1, PPFF ¶ 1).

Two police officers—Clifton Stephens and Timothy Powers, neither of whom are defendants in this case—were dispatched to deal with this situation. (DPFF ¶ 1). Shortly thereafter, they contacted Dr. Bentle, who informed them that, prior to leaving Dr. Bentle's office, Ms. Sutterfield had stated "I guess I'll go home and blow my brains out." (DPFF ¶ 2).

Believing that Ms. Sutterfield was in need of intervention to prevent an attempted suicide, Officers Stephens and Powers went to Ms. Sutterfield's house, but did not find her there. (DPFF ¶ 4). Then, at 2:45 p.m., the officers received a call from Dr. Bentle informing them that Ms. Sutterfield had called her several minutes before, stating that she was not in need of assistance and that Dr. Bentle should "call off" the police search for her. (DPFF ¶ 5).

Shortly after receiving that call, Officers Stephens and Powers reached the end of their shifts, at which time they returned to their district station and drafted a "Statement of Emergency Detention by Law Enforcement Officer," authorizing the custody of Ms. Sutterfield based upon the information provided by Dr. Bentle. (DPFF ¶ 7).

Shortly after Officers Stephens and Powers ended their shifts, at approximately 4:00 p.m., defendant Officer Jamie Hewitt was assigned to locate and detain Ms. Sutterfield, pursuant to the Statement of Emergency Detention. (DPFF ¶ 9).

Several hours later, just before 9:00 p.m., Officer Hewitt went to Ms. Sutterfield's residence. (DPFF ¶ 10). Officer Hewitt arrived, along with several other uniformed officers (several of the defendants in this case), and made contact with Ms. Hewitt through a storm door at the front of Ms.

Sutterfield's house. (DPFF ¶¶ 11–12, PPFF ¶ 2). At that time, Ms. Sutterfield refused to open or unlock the screen door or to allow the police to enter her home. (DPFF ¶ 12, PPFF ¶¶ 2–3). Ms. Sutterfield repeatedly told the officers that she was not in need of their assistance. (PPFF ¶ 5).

Unable to gain entry to the home without force, Officer Hewitt requested assistance from Sergeant Aaron Berken. (DPFF ¶ 13). Sergeant Berken arrived at approximately 9:00 p.m., and was apprised of the situation. (DPFF ¶¶ 15–16). He then made contact with Ms. Sutterfield, who again refused to allow entry into her home. (DPFF ¶¶ 18–19). At some point during this encounter, Ms. Sutterfield called 911, and the phone call to 911 stayed active through her discussion with Sergeant Berken. (PPFF ¶ 4, fn. 1).

After Ms. Sutterfield again refused to allow the officers to enter her home, Sergeant Berken forcibly broke the lock on Ms. Sutterfield's storm door and entered her home with several other officers. (DPFF ¶ 19, PPFF ¶ 6). He did not have a warrant to do so. (PPFF ¶ 11). Upon entering, the officers attempted to detain Ms. Sutterfield and were successful in doing so after engaging in a brief struggle. (DPFF ¶ 20, PPFF ¶¶ 7–8).

After detaining Ms. Sutterfield, the officers performed a protective sweep of her home. (DPFF ¶ 21, PPFF ¶ 9). During the sweep, which took approximately ten minutes, defendant Officer James Floriani noticed a compact disc case in plain view; when he picked that case up, he felt a weight

that he believed to be a firearm. (DPFF ¶¶ 22–23).[1] The case was locked, but Officer Floriani broke it open, revealing a handgun and a number of concealed-carry licences from multiple jurisdictions. (DPFF ¶ 23, PPFF ¶ 10). Officer Floriani also discovered a BB gun, made to realistically resemble a handgun. (DPFF ¶ 24).

Sergeant Berken instructed Officer Floriani to keep the firearms to be inventoried for safekeeping. (DPFF ¶¶ 25–26). Sergeant Berken has stated that he requested the firearms be retained by the police in order to prevent them from being used by a juvenile, if the juvenile were to enter the home without an adult while Ms. Sutterfield remained in the hospital. (DPFF ¶ 26). Officer Floriani stated that he believed seizure of the firearms was appropriate due to his fear that, upon Ms. Sutterfield's release from the hospital, she would use the handgun to commit suicide or the BB gun to provoke an officer to shoot and kill her. (DPFF ¶ 27).

The police then transported Ms. Sutterfield to the Milwaukee County Health Complex, pursuant to the Statement of Emergency that had been filed earlier in the day by Officers Stephens and Powers. (DPFF ¶¶ 7, 28).

2.      STANDARD OF REVIEW

Summary judgment is proper when the record establishes that there are no "genuine issue[s] of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "genuine issue of

---

[1] Ms. Sutterfield disputes this proposed fact, stating that the compact disc case "was in an 'opaque bag' and not in plain view." (Pl.'s Resp. to DPFF ¶ 23). Unfortunately, to dispute the proposed fact, Ms. Sutterfield cites to page 52 of her deposition, which does not include any information that would tend to show the compact disc case was not in plain view. Therefore, the Court is justified in accepting as unrebutted the defendants' proposed fact that the case was in plain view.

material fact" exists when a rational factfinder could find in favor of the non-moving party; in making this determination, the Court must construe all facts in a light most favorable to the nonmoving party and draw any reasonable inferences in the nonmoving party's favor, as well. *Ricci v. DeStefano*, -- U.S. ---, 129 S.Ct. 2658, 2677, 174 L.Ed. 2d 490 (2009); *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). However, a mere scintilla of evidence is insufficient to create such a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Having found that there are no material facts in dispute—aside from the potential dispute over damages, if the Court were to determine that the defendants' were not entitled to summary judgment—the Court may appropriately address the substantive legal dispute between the parties now, at the summary judgment stage. *See, e.g.*, Fed. R. Civ. P. 56(c).

3.    DISCUSSION

There are two broad issues that the Court must address in determining whether it can grant one of the parties' motions for summary judgment:

(1)    whether Ms. Sutterfield's suit against the City of Milwaukee or the defendant officers is barred by *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658 (as applied to the City), or principles of qualified immunity (as applied to the officers); and

(2)    whether, Ms. Sutterfield did, in fact, suffer a violation of her constitutional rights.

Logically, to save time on analysis, the Court would address the first issue—whether Ms. Sutterfield can sustain her suit—before addressing the second; here, though, the Court will reverse that order. It may seem to be a

waste of time to engage in an analysis of Ms. Sutterfield's constitutional claim when that claim may not (and, as the Court ultimately concludes, *does not*) lie against any of the defendants as a matter of law. But the Court's analysis of the potential constitutional violation informs its analysis of the potential bars to suit. Therefore, it is a productive use of the Court's time to delve into the constitutional issues raised by Ms. Sutterfield before dismissing her suit outright as barred by *Monell*, 436 U.S. 658, and principles of qualified immunity.

### 3.1 Constitutional Violation

Ms. Sutterfield alleges that the officers violated her constitutional rights by: (1) entering her home without a warrant (Def. Br. in Supp. 3–14); and (2) illegally searching her home and seizing her firearms (Def. Br. in Supp. 14–19). On both of these fronts, the officers' actions certainly straddle the line between constitutional and unconstitutional. But, in the end, the lawfulness of the police officers' actions are relevant only to the extent they inform the Court's *Monell*, 436 U.S. 658, and qualified immunity inquiries.

#### 3.1.1 Home Entry

The officers broke Ms. Sutterfield's door and entered her house without a warrant—an action that is presumptively unlawful under the Fourth Amendment. *See, e.g.*, *Payton v. New York*, 445 U.S. 573, 586 (1980), *United States v. Huddleston*, 593 F.3d 596, 600 (7th Cir. 2010). Nonetheless, there is an exception to that presumption in the case that the officers reasonably believed they were faced with a compelling need to act and no time to obtain a warrant. *Katz v. United States*, 389 U.S. 347, 357 (1967), *Stealgald v. United States*, 451 U.S. 204, 216 (1981). In such a circumstance, the Court can find that the search was constitutionally permissible under the

Case 2:11-cv-00486-JPS   Filed 04/30/12   Page 6 of 21   Document 39

"exigent circumstances" exception to the warrant requirement. *Katz*, 389 U.S. at 357, *Stealgald*, 451 U.S. at 216. The defendants also argue that a "community caretaker" exception makes their actions constitutionally permissible. (Def. Br. in Supp. 14–19 (citing *Wisconsin v. Horngren*, 2000 WI App 177, ¶¶ 8–11, 238 Wis. 2d 347, 617 N.W.2d 508, *Wisconsin v. Pinkard*, 2010 WI 81, ¶ 18, 327 Wis. 2d 346, 785 N.W.2d 592)).

### 3.1.1.1 Exigent Circumstances Exception

Here, the defendants do not argue that they had a warrant or that Ms. Sutterfield consented to the officers' entry into her house. Therefore, they must appeal to the exigent circumstances exception to the warrant requirement.

The government (in this case the defendants) has the burden to prove that exigent circumstances exist, and doing so requires a fairly strong showing that the surrounding circumstances were so severe as to justify a departure from the warrant requirement. *United States v. Patino*, 830 F.2d 1413, 1415 (7th Cir. 1987) (citing *United States v. Dowell*, 724 F.2s 599, 602 (7th Cir. 1984)). The Seventh Circuit, in *Patino*, held that exigent circumstances did not exist where the objective circumstances around a warrantless entry were not adequately severe to justify a departure from the warrant requirement. *Patino*, 830 F.2d at 1415–16. In that case, the Seventh Circuit was particularly concerned with the fact that the officers had called for backup and waited thirty minutes for that backup to arrive before entering the defendant's house without a warrant—the Court found that, in the interim period, the government could have easily sought a search or arrest warrant, but did not do so. *Id.* In so holding, the Seventh Circuit noted that, when the government advances an exigent circumstances argument, "it is appropriate to appraise

Page 7 of 21

the agents' conduct during the entire period after they had a right to obtain a warrant and not merely from the moment when they knocked at the front door." *Id.*, at 1416. In appraising the agents' conduct, the Court must consider whether such conduct was objectively reasonable.[2] *Katz*, 389 U.S. at 357, *Stealgald*, 451 U.S. at 216.

Without a doubt, this is a close case—especially given that nine hours passed between Dr. Bentle's first 911 call and Ms. Sutterfield's eventual arrest. That time period is *much* longer than periods found to negate an exigent circumstances argument in *Patino*, 830 F.2d at 1415–16, and this Court's recent *United States v. Edwards*, 2011 U.S. Dist. LEXIS 126059, *13 (E.D. Wis. October 31, 2011).

But, there are several factors that temper the fact that so much time passed between the 911 call and Ms. Sutterfield's arrest. First, from the Court's research, it appears that in Wisconsin the Statement of Emergency Detention (filled out by Officers Stephens and Powers, and authorized under Wis. Stat. § 51.15), acts as a sort of quasi-arrest warrant, giving police the power to take individuals into custody for mental evaluation purposes. *See, e.g.*, *Estate of Jennifer Vordermann v. City of Edgerton*, 09-CV-443, 2010 WL 3788669 (W.D. Wis. Sept. 23, 2012), *Wisconsin v. Kucik*, 2011 WI App 1, 330 Wis. 2d 832, 794 N.W.2d 926, *Wisconsin v. Tilley*, 2001 WI APP 224, 247 Wis. 2d 989, 635 N.W.2d 26. Granted, the Statement of Emergency Detention does not require any judicial authorization—in fact, the power to fill out the

---

[2]For this very reason—that the Court must evaluate the officers' conduct to determine whether it was objectively reasonable—the Court is unconcerned with defendant Officer Floriani's statement that exigent circumstances were not present. (Floriani Depo., at 18–19). Regardless of one officers' subjective belief, the Court must evaluate the situation objectively and according to the law.

Case 2:11-cv-00486-JPS   Filed 04/30/12   Page 8 of 21   Document 39

authorization and detain an individual pursuant to the Statement of Emergency Detention, rests solely with the police. Thus, the Statement of Emergency Detention cannot stand in place of a lawfully obtained warrant. But, in the Court's eyes, the Statement of Emergency Detention can justify the officers' failure to obtain a warrant, to the extent that the officers may have believed that they were authorized to take necessary action to detain Ms. Sutterfield.

Furthermore, the Supreme Court of the United States has recognized that "'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978), *Wayne v. United States*, 318 F.2d 205, 212 (C.A.D.C. 1963)). Here, the officers were attempting to "protect an occupant from [what they believed to be] imminent injury," and thus the Court is justified in believing that Ms. Sutterfield's suicide threat created exigent circumstances to which the police were responding. *Brigham city*, 547 U.S. at 403 (citing *Mincey*, 437 U.S. at 392, *Georgia v. Randolph*, 547 U.S. 103, 118 (2006)).

Also supporting such conclusion are the objective circumstances immediately prior to the officers' entry into Ms. Sutterfield's home. During that period—which appears to have lasted at most thirty minutes, from the arrival of Officer Hewitt on scene until Sergeant Berken's entry—Ms. Sutterfield acted somewhat erratically. (DPFF ¶¶ 10–19, PPFF ¶¶ 2–5). She refused to open her door to the police officers and treated the officers in somewhat hostile manner. (DPFF ¶¶ 10–19, PPFF ¶¶ 2–5). She called 911 and told the dispatcher that she did not entirely believe that the individuals were,

in fact, police officers. (DPFF ¶¶ 10–19, PPFF ¶¶ 2–5; Docket #30 (audio CD of 911 call)). While those facts may not be an indication of an overly tense situation standing alone, the Court is mindful of the fact that the officers were on the scene pursuant to a potential suicide threat, and were under the impression that Ms. Sutterfield owned a gun. Thus, her actions—stating that she was fine, but refusing to calmly talk to the officers or allow them entry—reasonably may have appeared to the officers as erratic. Simply put, if the Court were evaluating the thirty minutes prior to the officers' entry in a vacuum, the Court would determine that exigent circumstances existed to justify the warrantless entry.

Alas, the Court is not evaluating those thirty minutes in a vacuum, and the fact that nine hours passed without the officers obtaining a search warrant is troubling. But, in the end, the Court need not make a final determination on the constitutionality of the warrantless entry, because Ms. Sutterfield's suit is barred under *Monell*, 436 U.S. 658, and principles of qualified immunity. Nonetheless, the foregoing analysis will be beneficial to the Court's discussion of those bars to suit.

### 3.1.1.2 Community Caretaker Exception

The defendants also argue that, even if the officers' actions were not justified by exigent circumstances, they fall under a "Community Caretaker" function. (Def.'s Br. in Supp. 14–19 (citing *Horngren*, 2000 WI App 177, ¶¶ 8–11, 238 Wis. 2d 347, 617 N.W.2d 508, *Pinkard*, 2010 WI 81, ¶ 18, 327 Wis. 2d 346, 785 N.W.2d 592)).

The Court disagrees. While Wisconsin may recognize the Community Caretaker exemption to the warrant requirement in a broad swath of situations, *see Horngren*, 2000 WI App 177, ¶¶ 8–11, 238 Wis. 2d 347, 617

N.W.2d 508, *Pinkard*, 2010 WI 81, ¶ 18, 327 Wis. 2d 346, 785 N.W.2d 592, the Seventh Circuit has refused to read the exemption nearly as expansively, *United States v. Pichany*, 687 F.2d 204, 208–09 (7th Cir. 1982) (refusing to extend the holdings of *Cady v. Dombrowski*, 413 U.S. 433 (1973) and *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976), to cover warrantless entries into the home). The Wisconsin cases cited by the defendants are merely persuasive authority, and the Court is bound by Seventh Circuit law. In nearly thirty years since the court's decision in *Pichany*, the Seventh Circuit has not found reason to revise its holding; its law on the topic is firmly established. Thus, the Court sees no reason to accept Wisconsin's more expansive reading of the Community Caretaker exemption.

Accordingly, it finds that the Community Caretaker exemption does not make the officers' warrantless entry lawful.

### 3.1.2 Search and Seizure

Next, the Court turns to the actual search of Ms. Sutterfield's home and the officers' seizure of her guns and gun licenses. In this regard, Ms. Sutterfield argues that: (1) the officers conducted an unlawful and warrantless search of her home, resulting in the unlawful seizure of her guns (Pl.'s Br. in Supp. 14–17); and (2) the seizure of her guns further violated her Second Amendment rights to keep and bear arms (Pl.'s Br. in Supp. 17–18).

### 3.1.2.1 Search of Home

Because the officers did not have a warrant to search the premises of Ms. Sutterfield's home, their search was presumptively unlawful. *See, e.g.*, *Maryland v. Buie*, 494 U.S. 325, 331 (1990) (citing *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602 (1989), *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987), *New Jersey T.L.O.*, 469 U.S. 340–41 (1985), *United States v. Villamonte-*

*Marquez*, 462 U.S. 579, 588 (1983), *Delaware v. Prouse*, 440 U.S. 648, 654 (1979)). The defendants attempt to justify the search by arguing that it was conducted as a "protective sweep," lawful under *Buie*, 494 U.S. at 331.

The warrantless search of Ms. Sutterfield's home, *standing alone*, is of little concern to the Court. The officers had sufficient reason to conduct a protective sweep of the home. On the recording of Ms. Sutterfield's 911 call, a police officer can be heard asking whether there are any other individuals in the house, to which there is no response. (Docket #30). Further, the police officers were under the (correct) impression that Ms. Sutterfield owned a gun, making a firearm likely present in the home. Further, given the police officers' breaking Ms. Sutterfield's door to enter the home and the erratic treatment they had received prior to their entry, the situation was undoubtedly tense. Thus, given these circumstances, under *Buie*, the officers were justified in performing a quick sweep of Ms. Sutterfield's house to determine whether any armed, potentially perturbed, "lurking confederates" were in the area.[3] 494 U.S. at 331.

Of much greater concern to the Court is the officers' seizure of Ms. Sutterfield's guns and gun licenses during the protective sweep. This action certainly reaches nearer to the bounds of illegality than did the above-discussed warrantless entry or protective sweep. Here, Officer Floriani walked through the kitchen during the protective sweep and noticed a locked CD case in plain sight. Intrigued, he picked up the case; upon picking

---

[3] Of course, the protective sweep would be lawful only in the case that the officers had made lawful entry into the house to begin with. *See, e.g.*, *Buie*, 494 U.S. at 331. Given that the Court left this point open in its discussion of the officers' entry, the Court assumes *arguendo* that the entry was lawful for its discussion of the succeeding search and seizure.

Page 12 of 21

it up, Officer Floriani believed that the case felt as if it contained a gun. Thus, he opened the case and found a handgun, a BB gun made to look like a handgun, and several carrying permits.

Here, the Court must delineate between two actions—first, Officer Floriani's noticing of the CD case and, second, his opening of that case to locate the guns. Officer Floriani's mere noticing of the case does not give the Court pause. The scope of a protective sweep is narrowly confined to a cursory visual inspection of places in which a person might be hiding. *Id.*, at 335 ("a protective sweep [is] aimed at protecting the arresting officers…[and] is nevertheless not a full search of the premises, but may extend only to a cursory inspection of those places where a person may be found."). Here, the case was in plain sight in an area that Officer Floriani would have appropriately visually inspected during a protective sweep. Thus, he did not violate Ms. Sutterfield's rights by noticing it and picking it up.

On the other hand, the Court is troubled by Officer Floriani's decision to open the case and inspect its contents. The contents of the case were clearly not in plain sight. Given that the Officer Floriani could not see into the case, he had no reason to open the case; that is, while the weight inside may have *felt* like a gun, it could have been practically anything. A protective sweep gives officers the right to visually inspect the premises, during which time they may find evidence of crimes or dangerous materials lurking in plain sight, and they should not be expected to allow illegal or dangerous materials to remain in place where they could be used by others who happen upon them. But, when such materials are not in plain sight, officers cannot go looking for them, inspecting all the contents of a home at their leisure.

Here, Officer Floriani's opening of the locked CD case, without having plainly seen that it contained a gun, likely constituted a violation of Ms. Sutterfield's Fourth Amendment rights. If the Court were looking to Ms. Sutterfield's constitutional claims alone, leaving aside the issues regarding bars to her suit, it would likely determine that she suffered an actionable violation of her rights.

### 3.1.2.2 Second Amendment Rights

Ms. Sutterfield also claims that the seizure of her guns and licenses, standing alone and without any regard to the warrantless entry or search, violated her Second Amendment rights to keep and bear arms. (Pl.'s Br. in Supp. 17–18 (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010))).

The Court disagrees. While the handgun may be the "quintessential" self-defense weapon, and the right to keep a handgun in the home should be closely protected, there is no absolute right to keep a handgun. *Heller*, 554 U.S. at 628–29. Neither *Heller*, 554 U.S. 570, nor *McDonald*, 130 S.Ct. 3020, prohibit the government from seizing firearms for certain purposes. *Walters v. Wolf*, 660 F.3d 307 (8th Cir. 2011), *Ross v. Fed'l Bureau of Alcohol, Tobacco, & Firearms*, 807 F. Supp. 2d 362 (D. Md. 2011), *United States v. Walker*, 709 F. Supp. 2d 460 (E.D. Va. 2010). If we were to accept Ms. Sutterfield's argument, the government could seemingly never seize a handgun as evidence or prevent felons from owning handguns.

The Court is not willing to travel that path. Thus, the Court must conclude that, standing alone, the officers' temporary seizure of Ms. Sutterfield's handguns was not a violation of her Second Amendment rights.

3.2     Bars to Suit

Despite the lengthy foregoing discussion of the constitutional considerations, the Court's ultimate decision rests squarely on two principles that bar Ms. Sutterfield's suit against the City and the police officer defendants, respectively: (1) *Monell*'s requirement that, to sustain a suit against a municipality, a plaintiff must show a pattern or practice of unconstitutional behavior; and (2) the principle of qualified immunity, which prevents government officials from being held liable for their discretionary actions.

### 3.2.1   City of Milwaukee Liability

The Court first takes up Ms. Sutterfield's claims against the City of Milwaukee. Those claims cannot stand under the principles of *Monell*, 436 U.S. 658, 690–94 (1978).

*Monell* held that a municipality, such as the City of Milwaukee, cannot be held liable under 42 U.S.C. § 1983, other than for its own violations of federal law. 436 U.S. at 694. A violation is a municipality's "own" violation only when it "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or has a "custom" of causing deprivations of civil rights, "even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.*, at 690–91. This has come to be known as the "policy or custom" or "custom, policy, or practice" requirement to sustain a suit against a municipality under § 1983. *See, e.g.*, *Los Angeles Cty. v. Humphries*, 131 S.Ct. 447, 452 (2010), *Fitzgerald v. Barnstable School Committee*, 555 U.S. 246, 258 (2009).

Page 15 of 21

Ms. Sutterfield has not alleged that the City sustained any unlawful custom, policy, or practice, that entitle her to maintain suit against the city, a fact that Ms. Sutterfield seems to more or less admit. (*See, e.g.*, Reply, 4 ("Defendants…also argue that Plaintiff has failed to plead a *Monell* claim. Perhaps so… "). Without such a showing, *Monell* bars Ms. Sutterfield's claim against the City. 436 U.S. at 690–94. Ms. Sutterfield attempts to salvage her claim against the City by arguing that the City "actively participated in the Second Amendment deprivation." Even assuming, *arguendo*, that the City somehow "actively participated," in storing Ms. Sutterfield's guns,[4] the Court has held that there was no violation of Ms. Sutterfield's Second Amendment rights. Thus, on the one claim that Ms. Sutterfield seems to maintain that her claims against the City should escape the *Monell* bar, the Court has already determined that there was no actionable violation.

Ms. Sutterfield could perhaps sustain her suit if she were to argue that it is unconstitutional for the City to follow Wis. Stat. § 51.15 and require that individuals who are the subject of Statement of Emergency Detention be taken into custody. She comes near to making that argument, but never does so. (*See, e.g.*, Reply 4–7).

Accordingly, without Ms. Sutterfield's having made any allegations of a custom, policy, or practice, the Court is obliged to grant the defendants' motion for summary judgment on all of Ms. Sutterfield's claims against the City.

---

[4]In fact, as the Court understands *Monell*, a municipality cannot be held to have "actively participated" *unless* it had a custom, policy, or practice. In other words, because a municipality is not an entity that can affirmatively act (it is not, strictly, volitional like an individual person), it is only when the municipality adopts a policy or its employees engage in an uncorrected course of conduct (a "custom"), that the municipality can be said to have acted in any way.

### 3.2.2 Police Officer Liability

Finally, the Court addresses whether Ms. Sutterfield may sustain her suit against the individual defendant police officers, despite principles of qualified immunity.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Thus, the first inquiry is whether the defendant officers were "performing discretionary functions." *Id.* Ms. Sutterfield alleges that they were not, because department policy required the officers to make contact with Ms. Sutterfield and take her into custody pursuant to the Statement of Emergency Detention. (*See, e.g.*, Reply 4–5). But Ms. Sutterfield does not argue that her detention, itself, was unlawful—rather, she argues that the officers' entry into her home, search of the premises, and seizure of her guns was unlawful. The (unchallenged) detention of Ms. Sutterfield is the only aspect over which the officers arguably lacked discretion; in regards to all other aspects, the police were forced to exercise their discretion in response to a novel situation.

Having established that the officers were performing discretionary functions, the Court must now turn to evaluating whether the officers violated Ms. Sutterfield's "clearly established rights." Typically, this is a two-step analysis: first, the court should determine whether the alleged conduct violated Ms. Sutterfield's constitutional rights; then, if the Court were to find such a violation, it should determine whether such rights were "clearly

established." *Saucier v. Katz*, 533 U.S. 194, 205 (2001); *see also Sherman v. Four County Counseling Center*, 987 F.2d 397, 401 (7th Cir. 1993) (citing *Fiorenza v. Nolan*, 965 F.2d 348, 351–52 (7th Cir. 1992), *Auriemma v. Rice*, 910 F.2d 1449, 1453 (7th Cir. 1990) (en banc), *cert. denied*, 501 U.S. 1204 (1991)). Here, the Court has already discussed the officers' actions, and decided that such actions, at the very least, come near to having violated Ms. Sutterfield's rights.

Therefore, the Court will assume, *arguendo*, that the officers' actions did, in fact, violate Ms. Sutterfield's constitutional rights; making that assumption, the Court will evaluate whether those rights were so clearly established so as to strip the officers of their qualified immunity.

The Court concludes that they were not so clearly established. Turning first to the officers' warrantless entry into the home, the Court concluded that the officers' actions were taken under circumstances that were very near to being exigent. Given the tense situation that the officers found themselves faced with and their further concern for Ms. Sutterfield's well-being, the situation in which they were acting was not "clearly" unlawful under the law. In general, the exigent circumstances analysis presents a wide grey area into which officers' conduct may fall; the exigent circumstances exception has certainly never been "sufficiently particularized" such that it would put these defendants on "notice that their conduct is probably unlawful." *Henderson v. DeRobertis*, 940 F.2d 1055, 1059 (7th Cir. 1991), *cert. denied*, 503 U.S. 966 (1992).

Furthermore, and perhaps more importantly, the officers could reasonably have believed that they acted under the Community Caregiver exemption recognized by Wisconsin law, which would have allowed them to not only enter Ms. Sutterfield's home, but also to perform a warrantless

Case 2:11-cv-00486-JPS   Filed 04/30/12   Page 18 of 21   Document 39

search (and eventually seize her guns and licenses). *See, e.g.*, *Horngren*, 2000 WI App 177, ¶¶ 8–11, 238 Wis. 2d 347, 617 N.W.2d 508, *Pinkard*, 2010 WI 81, ¶ 18, 327 Wis. 2d 346, 785 N.W.2d 592. While the Seventh Circuit has refused to read the Community Caregiver exemption nearly as expansively as Wisconsin, *Pichany*, 687 F.2d at 208–09, and would thus seem to bind this Court to find that such an exemption clearly does not apply, the Court cannot expect that police officers are schooled in the nuances of the law as it differs by jurisdiction. The police must be able to act decisively to prevent injury to citizens, *Brigham City*, 547 U.S. at 403 (2006), especially when they are acting upon "information from a third party whom it seems reasonable to believe is telling the truth," *Sow v. Fortville Police Dept.*, 636 F.3d 293, 302 (2011) (citing *Kelley v. Myler*, 149 F.3d 641, 647), such as Dr. Bentle in this case. By entering Ms. Sutterfield's home, searching it, and seizing items that they believed to pose a danger to both Ms. Sutterfield and members of the community who may (though it was unlikely) happen upon those items, the officers acted in that decisive, though discretionary way; and, under the laws of Wisconsin, doing so was not clearly unlawful. *See, e.g.*, *Horngren*, 2000 WI App 177, ¶¶ 8–11, 238 Wis. 2d 347, 617 N.W.2d 508, *Pinkard*, 2010 WI 81, ¶ 18, 327 Wis. 2d 346, 785 N.W.2d 592.

Accordingly, the Court is obliged to conclude that the defendant officers are entitled to qualified immunity, as their actions did not violate Ms. Sutterfield's "clearly established" rights. *See, e.g.*, *Saucier*, 533 U.S. at 205, *Sherman*, 987 F.2d at 401, *Fiorenza*, 965 F.2d at 351–52, *Auriemma*, 910 F.2d at 1453. As such, the Court must grant the defendants' motion for summary judgment as to Ms. Sutterfield's claims against the defendant police officers.

5. CONCLUSION

Having determined that Ms. Sutterfield cannot sustain her suit against either the City or the individual officers, the Court concludes that the defendants' motion for summary judgment (Docket #28) must be granted in its entirety, and this case dismissed in full, as Ms. Sutterfield cannot maintain any of her claims. In keeping with that conclusion, the Court is obliged to deny Ms. Sutterfield's motion for summary judgment (Docket #29) in full.

The last remaining matter for the Court to address is the defendants' motion to seal a number of documents that they purport contain information that is confidential under Wisconsin law. (Docket #24). The defendants and Ms. Sutterfield agree that the Statement of Emergency Detention is confidential. (*See, e.g.*, Docket #26 (citing Wis. Stat. § 51.30(4), *Watton v. Hegerty*, 2008 WI 74, ¶ 22, 311 Wis. 2d 52, 751 N.W.2d 369, *Milwaukee Deputy Sheriff's Ass'n v. City of Wauwatosa*, 2010 WI App 95, ¶ 20, 327 Wis. 2d 206, 787 N.W.2d 483), #25). Ms. Sutterfield goes further, though, asking that all briefs in this matter be sealed. (Docket #25). The Court must also pass upon the disclosure of several affidavits submitted by police officers in this matter. (Docket #26, exs. A2–D).

The Court agrees that the Statement of Emergency Detention should be sealed, as it contains potentially sensitive medical information. This opinion, the parties briefs, and the affidavits of the police officers should not be sealed, though. Litigation must be "conducted in public to the maximum extent" possible without unduly infringing upon the privacy interests of parties. *Hicklin Eng'r, L.C. v. Bartell*, 439 F.3d 346, 348 (7th Cir. 2006). Here, the mere existence of the Statement of Emergency Detention does not justify the sealing of multiple aspects of this case (from affidavits, to briefs, to this

decision). In fact, the Statement of Emergency Detention is an extremely important part of this case; while its particulars should, perhaps, remain out of public view to protect Ms. Sutterfield's privacy interests, it is nonetheless important for this Court's opinion and the items upon which it based that opinion (discovery materials and the parties' briefs) to be a part of the public record, in order that the public understand the justification for the Court's rulings.

Accordingly,

IT IS ORDERED that the defendants' Motion for Summary Judgment (Docket #29) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the plaintiff's Motion for Summary Judgment (Docket #28) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the defendant's Motion Requesting an Order to Seal or Publicly Release Confidential Documents Relative to the Defendants' Motion for Summary Judgment (Docket #24) be and the same is hereby GRANTED, insofar as the Statement of Emergency Detention (Docket #26, ex. A1) be and the same shall remain SEALED, but that all remaining documents that were filed under seal (Docket #24, #26, #31, #32, #33, #34, #35, #37; Docket #26, exs. A2–D) be and the same are hereby UNSEALED and publicly released via the Court's electronic filing system.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 30th day of April, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge